Lloyd R. WALTERS, Individually and on behalf of all others similarly situated

v.

Edwin W. EDWARDS, etc., et al.

Civ. A. No. 74–653.

United States District Court, E. D. Louisiana.

May 12, 1975.

Louis R. Koerner, Jr., Koerner & Babst, New Orleans, La., for plaintiff.

Kendall L. Vick, Asst. Atty. Gen. of La., New Orleans, La., for defendants.

Before WISDOM, Circuit Judge, and BOYLE and RUBIN, District Judges.

BOYLE, District Judge:

Plaintiff Walters, suing on behalf of himself and all others similarly situated, seeks a judgment declaring that L.S.A.–R.S. 18:270.204 [1] is unconstitutional and for a permanent injunction prohibiting enforcement of the statute.

---

1. § 270.204 *Party affiliation; blank space not required to be filled; voting in primary; change in party affiliation*

The applicant need not declare a party affiliation in order to be registered. He shall, however, if he does not wish to affiliate, circle the "None" on the LR–68 application card. Failure to affiliate however, renders it unlawful for him to vote in any primary of any political party, as long as he has not declared his party affiliation.

However, any person may change his party affiliation by applying to the registrar, requesting in writing that the change be made. The registrar, upon such request shall note the political party designated by the registrant in the proper column of the original application card. Such change of affiliation in his registration shall not permit the registrant to vote in any primary held by the political party to which he has changed his affiliation within six months of the change. During this period he may not vote in the primary held by the political party which he has renounced and abandoned.

Where a registrant has registered without declaration of party affiliation and afterwards desires to affiliate with some party, he shall cause the registrar to enter the party he selects in the proper space of the original application card and on the voting certificate by making written application to him to do so. The designation of party affiliation, in accordance with this Paragraph renders the registrant eligible to vote in the party primary next following the designation. The registrar shall note on the original application card the date of the change of party affiliation.

Jurisdiction is conferred on the court by 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1981 et seq.

The following facts are stipulated by the parties:

1. The class which plaintiff represents is composed of those persons in St. Tammany Parish who have changed their party affiliation from Republican to Democrat within six months preceding the date of the Democratic primary election of March 23, 1974 and within six months preceding the date of the Democratic primary election of May 4, 1974. The class as set forth above is eighty-nine persons in number or more and is accordingly so numerous that joinder or all members is impractical; that the questions of law and fact, as set forth hereinafter, are common to all of the members of the class; that these questions of law and fact are predominating in the complaint; that these questions are typical of the claims of the class; and plaintiff will fairly and adequately represent the interests of the class. The defendants have acted on grounds generally applicable to the class thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

2. Plaintiffs and the class are citizens of the State of Louisiana and residents of and domiciled in St. Tammany Parish. All of them have changed their party affiliation from Republican to Democrat within six months of the date of the Democratic primary election, March 23, 1974 and the Democratic primary election of May 4, 1974. After plaintiffs changed their party affiliation from Republican to Democrat, they were notified by letter that they would not be allowed to vote in the Democratic primary of March 23, 1974 because of R.S. 18:270.204 and the opinions of the Attorney General. In addition, the Registrar of Voters of St. Tammany Parish caused to be published in the two Slidell newspapers the contents of the letter which explained that those who had changed their party affiliation within six months of the Democratic primary election of March 23, 1974 would not be allowed to vote. Plaintiffs desire to vote and participate in the Democratic primary scheduled for March 23, 1974, and the Democratic primary election scheduled for May 4, 1974.

3. In a previous case, *Fontham v. McKeithen*, D.C., 336 F.Supp. 153 (1971) the Attorney General of the State of Louisiana entered into a stipulation, before the United States Supreme Court, that: "This suit has been settled by the parties and the statutes attacked as unconstitutional by the appellants are no longer being enforced by officials of the State of Louisiana." One of the statutes referred to was R.S. 18:270.204.

4. In accordance with the Attorney General's stipulation an opinion dated October 5, 1972 was rendered which concluded R.S. 18:270.204 was probably unconstitutional.

5. Included within the class is a subclass of persons, who are citizens of the State of Louisiana and residents of and domiciled in the Parish of St. Tammany, who have changed their party affiliation from Republican to Democrat within six months prior to the filing of the complaint in reliance on the stipulation and opinion of the Attorney General dated October 5, 1972, which resulted from the matter entitled: *Fontham v. McKeithen*.

6. On February 7, 1974, only 14 days before the registration rolls closed in St. Tammany Parish, Louisiana, the Attorney General issued opinion No. 74–204 which rescinded the previous opinion and upheld the constitutionality of R.S. 18:270.204. Even though the opinion was dated February 7, 1974, the Registrar of Voters for St. Tammany Parish did not receive it in his office until the 14th of February, 1974, 6 days from the date the registration rolls were closed in St. Tammany Parish.

7. Prior to February 14, 1974, plaintiffs were informed by the Registrar of Voters for St. Tammany Parish that they would be able to change their party affiliation and vote in the Democratic Primary election of March 23, 1974.

The court on March 11, 1974 issued a temporary restraining order with the consent of all parties enjoining the defendants, their agents, officers, employees and those acting on behalf of or in concert with them

A. from continuing to enforce Louisiana R.S. 18:270.204 and all related opinions, regulations and administrative policies;

B. from prohibiting or interfering with plaintiff from voting in the Democratic primary election to be held in Slidell, St. Tammany Parish, Louisiana on the 23rd day of March, 1974 and with any other Democratic primary election in St. Tammany Parish;

C. from requiring plaintiff to wait six months following his change of party affiliation in order to vote in the Democratic primary elections.

The case has been submitted to the court for adjudication on the parties' stipulation of facts and memoranda.

The plaintiff has sued on behalf of a class consisting of certain registered voters in St. Tammany Parish, Louisiana, similarly situated. Whether or not the action is maintained as such a class action, the result we reach in this case will be effective throughout Louisiana.

Plaintiffs allege that the Louisiana statute is unconstitutional because it is an unreasonable limitation on the right to vote unjustified by a compelling state interest.

They further allege that the statute is overinclusive because it prohibits voting by those who genuinely wish to change their party affiliation, and on the other hand it is underinclusive because it is not fully effective to prevent "raiding" of one party's primary election by adherents of the opposing political party.

Finally, plaintiffs claim the statute results in a denial of equal protection because it does not require voter registering for the first time or those registering with a political party after having been registered as independents to observe the six month waiting period.

The issue of the constitutionality of this statute was previously litigated in *Fontham v. McKeithen*, D.C., 336 F. Supp. 153 (1971) before a three-judge court consisting of Circuit Judge Wisdom and District Judges West and Gordon.[2] In that case, the three-judge court in an opinion by Judge West held that "there is a reasonable relation between the terms of L.S.A.–R.S. 18:270.-204 and the State's interest in protecting the integrity of political parties within the State." *Fontham v. McKeithen, supra* at 158. Judge Gordon concurred, holding that the plaintiffs had shown no reason other than inconvenience or lack of knowledge of the law to justify their failure to change political parties in time to vote in the primary election of their new party.

Judge Wisdom, in his dissenting opinion, concluded that the "compelling state interest" test was the correct standard of review to use in evaluating the statute, rather than the "rational basis" test used by the majority. Applying the former standard, Judge Wisdom found that the statute discriminated against persons registering a party affiliation and in favor of independents. He also stated that if the prevention of raiding is a compelling state interest then "the

2. The case also involved the constitutionality of L.S.A.–R.S. 18:270.202, which provided for durational residency requirements for voting in state elections. The statute read in part:

Every citizen of the United States and of Louisiana, native born or naturalized, who is twenty-one years of age or who will have attained the age of twenty-one years prior to the next election and who possesses the following qualifications and who has complied with the provisions of this Chapter, shall be eligible for registration as a voter:

(1) He shall have been an actual bona fide resident of the state for one year, of the parish for six months, and of the municipality in municipal elections four months, and of the precinct in which he offers to register as a voter, three months next preceding any election.

six month waiting period is an unconstitutionally imprecise means of accomplishing the state's objective." *Fontham v. McKeithen, supra* at 174. He pointed out that the waiting period may reduce raiding, but only by penalizing those who wish to change their party affiliation for legitimate reasons.

While *Fontham* was on appeal to the Supreme Court, the parties stipulated that the Louisiana statutes attacked as unconstitutional were no longer being enforced. The appeal was dismissed on January 8, 1973.[3]

On February 7, 1974, the Attorney General of Louisiana recalled his prior opinion that L.S.A.–R.S. 18:270.204 was unconstitutional and should not be enforced. Relying on *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed. 2d 1 (1973) which was decided subsequent to the dismissal of the appeal in *Fontham,* the Attorney General concluded that the Louisiana statute should continue to be enforced. This suit was filed on March 11, 1974, challenging the Attorney General's directive.

Since *Fontham,* the Supreme Court has decided *Rosario v. Rockefeller, supra,* decided March 21, 1973, and *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), decided November 19, 1973, which involve issues similar to those presented here. In *Rosario,* the court upheld a New York statute which required an eight to eleven month delay between a change in party registration and voting in the primary election of the new party. In *Kusper,* the Supreme Court held unconstitutional an Illinois statute which prohibited one from voting in the primary election of a political party if he had voted in the primary of any other party within the preceding 23 months.

*Rosario* and *Kusper* are the only cases in which the Supreme Court has considered the constitutionality of voting statutes similar to the one in question here.

### STANDARD OF REVIEW

■ The initial question to be determined by the court is the proper standard to be used in evaluating the Louisiana statute. Two differing standards have been utilized in evaluating a state's classification of its citizens. When the legitimate state interest test is applied, a classification will be upheld if rationally related to a legitimate state purpose. When the compelling state interest test is applied, a classification which is "suspect" or which relates to a "fundamental interest" will be upheld only if justified by a compelling state interest. *See Shapiro v. Thompson,* 394 U.S. 618, 655, 89 S.Ct. 1322, 22 L.Ed.2d 600 (Harlan, J., dissenting); Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065 (1969). *See also Dorrough v. Estelle,* 497 F.2d 1007, 1009 (5 Cir. 1974), *rev'd,* 420 U.S. 534, 95 S.Ct. 1173, 43 L. Ed.2d 377 (1975).

This case does not involve a classification which has been held by the Supreme Court to be suspect,[4] thus requiring the use of the compelling state interest test.

---

3. See Record Document No. 1, Exhibit C. R.S. 18:270.202, the statute prescribing durational residence requirements in Louisiana, has since been amended by Acts 1972, No. 379, § 1 to read as follows:

 Every citizen of the United States and of Louisiana, native born or naturalized, who is twenty-one years of age or who will have attained the age of twenty-one years prior to the next election and who possesses the following qualifications and who has complied with the provisions of this Chapter, shall be eligible for registration as a voter:

 (1) He shall be an actual bona fide resident of the state, parish, municipality and precinct in which he offers to register as a voter.

4. Classification according to the following criteria has been held to be suspect: race, Loving v. Virginia, 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1969); alienage, Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); sex, Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Classification according to wealth alone is not a suspect classification. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973).

██ However, the compelling state interest test is also applicable where regulation of a fundamental right[5] is involved. It is well settled that the right to vote is a fundamental right. *Dunn v. Blumstein*, 405 U.S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972); *Evans v. Cornman*, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 220 (1886).

Although it is clear that the right to vote is fundamental, it is not so clear whether every regulation or restriction of the right to vote should be measured against the compelling state interest test. In *Reynolds v. Sims* (a reapportionment case), the Supreme Court held:

"Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L. Ed.2d 506, 527 (1964).

Since *Reynolds*, the Supreme Court has applied the compelling state interest test in a number of cases involving voting. *See Kusper v. Pontikes, supra; Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Dunn v. Blumstein, supra; City of Phoenix v.*

*Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Evans v. Cornman, supra; Cipriano v. Houma*, 395 U. S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); *Kramer v. Union Free School District No. 15, supra; Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L. Ed.2d 675 (1965).

However, the Court has also held that not every limitation or burden on the right to vote is subject to strict review. *McDonald v. Board of Election*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). The more lenient rational relationship test has been applied in cases involving an absentee voting statute,[6] voting in water storage district elections,[7] and to a waiting period for voting in primary elections after a change in party registration.[8]

In *Rosario v. Rockefeller*, the Supreme Court measured the New York statute in question against the rational relationship test. It rejected the plaintiffs' claim that the compelling state interest test should be applied to very statute involving voting, and held that the strict test applies only where "the State totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote." *Rosario v. Rockefeller*, 410 U.S. at 757, 93 S.Ct. at 1249, 36 L. Ed.2d at 6 (1973).

The Court found the New York statute[9] did not have the effect of absolutely disenfranchising the class of

---

5. Among the rights defined as fundamental are interstate travel, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); privacy, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); free expression, Police Department of City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); procreation, Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

6. *See* McDonald v. Board of Election, supra.

7. *See* Associated Enterprises v. Toltec Watershed Improvement District, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973).

8. *See* Rosario v. Rockefeller, supra.

9. The court described the operation of the statute in question as follows:

The effect of § 186 is to require a voter to enroll in the party of his choice at least 30 days before the general election in November in order to vote in the next subsequent party primary. If a voter fails to meet this deadline, he cannot participate in a party primary until after the following general election. Section 187 provides an exemption from this waiting period for certain classes of voters, including persons who have attained voting age after the last general election, persons too ill to enroll during the previous enrollment period, and persons who moved from one place to

which plaintiff was a member. Instead, the statute imposed a time deadline on their enrollment. Noting that plaintiffs had not explained why they did not enroll prior to the deadline, the court concluded that if the plaintiffs had been disenfranchised, it was the result of their own failure to take the necessary steps to enroll in the party of their choice within the time limit.

The court in *Rosario* distinguished cases which used the compelling state interest analysis.[10] Some of the cases which were distinguished had been used by Judge Wisdom in support of his dissent in *Fontham.*

The court in *Kusper v. Pontikes, supra,* chose to apply the compelling state interest test to the Illinois statute[11] in question in that case. The court distinguished *Rosario* by finding that in *Rosario* the plaintiffs had disenfranchised themselves by failing to change parties within the time limit imposed by the statute; in Illinois, there was no action a voter could take to make himself eligible to vote in the primary of his new party except to forego voting in a primary for nearly two years. The court specifically held that, ". . . a significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest."[12]

Since both the compelling state interest test and the rational relationship test have been applied to various limitations on the right to vote, we consider the criteria to be used in choosing one standard in lieu of the other.

It should be noted that the choice of a standard of review does not determine whether the constitutionality of the statute is ultimately upheld.[13]

■ The choice of a standard is based in part on the effect the statute will have on the exercise of the fundamental right to vote. *See McDonald v. Board of Elections, supra.* Therefore, this court must examine the nature and extent of impact the statute has on the right to vote against the background of Louisiana election procedures.

Louisiana statutes provide for primary elections to be held from early August until December.[14] In addition, primary elections for local offices may be held at other times throughout the year. For example, the March 23, 1974 Democratic primary in Slidell, Louisiana, which occasioned this suit, was held to choose candidates for the offices of mayor, city council and chief of police in the City of Slidell, and state Democratic committeemen. A second primary election was held in the City of Slidell on May 4, 1974.

another within a single county. Under § 187, these classes of voters may be specially enrolled as members of a party even after the general election has taken place. (Footnote omitted).
Rosario v. Rockefeller, 410 U.S. at 754, 93 S.Ct. at 1248, 36 L.Ed.2d at 4–5 (1973).

10. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S. Ct. 1897, 23 L.Ed.2d 647 (1969); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L. Ed.2d 370 (1970); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed. 2d 523 (1970); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

11. Ill.Rev.Stat. C. 46, § 7–43 provides in part: "no person shall be entitled to vote at a primary:
 * * * * *

"(d) If he has voted at a primary held under this Article 7 of another political party within a period of 23 calendar months next preceding the calendar month in which such primary is held . . . ."

12. Kusper v. Pontikes, 414 U.S. at 58, 94 S. Ct. at 308, 38 L.Ed.2d at 267 (1973).

13. *Compare* Prigmore v. Renfro, 356 F.Supp. 427 (N.D.Ala.1972), *aff'd mem.,* 410 U.S. 919, 93 S.Ct. 1369, 35 L.Ed.2d 582 (1973) [rational relationship test, statute constitutional]; *with* Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) [rational relationship test, statute unconstitutional] *and* Frontiero v. Richardson, supra [compelling state interest test, regulation unconstitutional].

14. *See* L.S.A.–R.S. 18:301–305, 18:356, 18:358. *See also* La.Const. art. 3, § 4(C); art. 4, § 3(A); art. 5, §§ 3, 8(C), 15(C) (1974). *See also* Footnote 27.

The court takes judicial notice of the fact that statewide primary elections took place on August 17, 1974, and second primaries were scheduled and held on September 28, 1974.

A voter who wished to change his party registration and also wished to vote in these four primaries (March 23, May 4, August 17, and September 28, 1974) would be prevented from changing his party registration for a period from September 23, 1973, until September 30, 1974.[15] Similarly, a voter wishing to vote in local primaries in March and May and in primaries which would be held in August, September, November and December would be prevented from changing registration from September of the year before the March election until after the last primary is held in December, of the next year, or a period of 15 months.

Thus, although the statute appears to provide for a waiting period of six months after a change in political party affiliation before voting in the primary of a new party, a voter who plans ahead in order not to miss voting in a primary may be "locked in" his prior political affiliation for up to 15 months and possibly more.

■ While the right to vote is fundamental, the right to associate with the political party of one's choice is also fundamental. *See Kusper v. Pontikes, supra; Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968). The right to participate in the selection of party candidates through voting in primary elections is an integral part of this right. If the Louisiana statute requires a voter to choose between two fundamental rights, it may be necessary for the statute requiring such a choice to meet the strict scrutiny of the compelling state interest test.

■■ It is clear that a voter cannot be required to forego the exercise of a fundamental right, such as the right to travel, in order to vote, *Dunn v. Blumstein, supra,* nor can the voter be required to undergo serious inconvenience in order to vote unless the requirement serves a compelling state interest. *See Cipriano v. City of Houma, supra; Kramer v. Union Free School District, No. 15, supra.*

Therefore, it is necessary to determine whether the Louisiana statute necessarily disenfranchises a group of voters who can do nothing to prevent their disenfranchisement. *See Rosario v. Rockefeller, supra,* 93 S.Ct. at 1249, and *Kusper v. Pontikes, supra,* 94 S.Ct. at 309.

The defendants argue that voters can prevent their disenfranchisement under the Louisiana statute by changing their party registration at a time when no primary elections are scheduled during the following six months. Thus they would not be prevented from voting at all.

This argument is similar to the point made by the Supreme Court in *Rosario* that under the New York statute, it would be possible for a voter to change his party registration every year and never miss voting in a primary election.

Plaintiffs argue that the statute does necessarily result in disenfranchisement because it is not always possible for a voter to know for certain at the time he changes his registration that a primary election will not be called during the next six months.

Plaintiffs also contend that the voter who does plan ahead and, after inquiring, finds that primary elections are scheduled to be held in the next six months must then choose between two fundamental rights: the right to vote and the right to freely associate for political purposes. If several primary elections are scheduled with less than six months intervening between them, the voter may lose the right to vote in one

15. This presupposes that there is no primary scheduled earlier than March 30, 1975 at the time the voter changes parties and no primary election is scheduled for earlier than March 30, 1975, after the voter changes his party registration.

or more elections, or he may be required to postpone his change of party affiliation until the primary elections are past.

In determining whether to apply the compelling state interest or the rational relationship test in voting cases, the Supreme Court has considered whether the challenged statute imposes a "significant encroachment,"[16] "an infringement,"[17] "a restriction,"[18] or "an unconstitutionally onerous burden"[19] on the right to vote. In cases involving the right of free association, the court has invalidated statutes which constitute a "substantial restraint"[20] and a "significant interference"[21] with that right. These labels provide little assistance in determining the type of statute which requires the application of the compelling state interest test.

## COMPELLING STATE INTEREST TEST

 If the compelling state interest test is applied in this case, the state must bear a heavy burden in justifying the statute. It must show that it has a compelling interest that the statute is designed to meet, and the statute meets that interest while imposing the least possible interference with constitutionally protected activities.

 The statute must fall if the state has no compelling interest, if the statute does not serve the compelling interest or if there are other reasonable ways to achieve state goals with a lesser burden on constitutionally protected activities. The statute will also fall if it is overbroad, that is, if it eliminates the activity sought to be eliminated, but in addition eliminates other activity that is legitimate. *See Dunn v. Blumstein, supra.*

The statute in question is designed to prevent "raiding," a practice "whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Rosario v. Rockefeller,* 410 U.S. at 760, 93 S.Ct. at 1251, 36 L.Ed.2d at 8 (1973).

Does the state have a compelling interest in preventing this practice? Judge Wisdom in his dissent in *Fontham v. McKeithen* reached no conclusion on this question because he decided that, "[e]ven assuming that preventing this practice is a compelling state interest the six month waiting period is an unconstitutionally imprecise means of accomplishing the state's objective."[22]

The Supreme Court which applied the compelling state interest test in *Kusper v. Pontikes* never directly answered the question of whether the prevention of raiding is a compelling state interest. It acknowledged that the state has a "legitimate interest" in preventing raiding, but held that the device chosen to effect its goal conspicuously infringed on basic liberties.[23]

If it is determined that the prevention of raiding is a compelling state interest, the state must then demonstrate that the means chosen has the least possible impact on protected rights such as the right to vote and the right to freely associate for political purposes.

The state must demonstrate that a waiting period of six months is necessary to effect its goal and a shorter period will not suffice. The argument is made that one who changes parties six months before a primary election is more likely to be changing out of a sincere desire to reflect a change in politi-

16. Kusper v. Pontikes, 414 U.S. at 58, 94 S. Ct. at 308, 38 L.Ed.2d at 267 (1973).

17. Reynolds v. Sims, 377 U.S. at 562, 84 S. Ct. at 1381, 12 L.Ed.2d at 527 (1964).

18. Dunn v. Blumstein, 405 U.S. at 336, 92 S.Ct. at 1000, 31 L.Ed.2d at 281 (1972).

19. Rosario v. Rockefeller, 410 U.S. at 760, 93 S.Ct. at 1251, 36 L.Ed.2d at 8 (1973).

20. NAACP v. Alabama, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1500 (1958).

21. Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 417, 4 L.Ed.2d 480, 486 (1960).

22. Fontham v. McKeithen, *supra,* at 174.

23. Kusper v. Pontikes, 414 U.S. at 61, 94 S. Ct. at 309, 38 L.Ed.2d at 269 (1973).

cal parties than merely to assure that the weakest candidate of the opposing party enters the general election. Can the same assumption be made about one who changes five months before the primary? If any lesser period of time will effect the state's interest in preventing raiding, a greater period of time which impinges on the right to vote and right to freely associate may not be sustained.

The state must also justify the exemption from the effect of the statute of two groups: those registering to vote for the first time, and those registering a party affiliation for the first time, having previously been registered as independents. These groups need not wait the six months otherwise required of those changing parties before voting in a primary election.

It may be argued that individual attempts at raiding one political party can logically be expected to come from those previously registered with the opposing party rather than new voters or independents. However, the concept of raiding can also include widespread attempts to influence primaries, perhaps through the offering of incentives to register with a political party and to vote a certain way in their primary. One organizing such a campaign of massive raiding may attempt to influence independents and new voters as well as those of the opposing party. The statute does not prevent such attempts with respect to independents and new voters.

Such a classification of voters into those previously registered with a political party and those who previously were not registered with a political party (independents and new voters), must also meet the compelling state interest test if it significantly interfers with a fundamental right such as the right to vote. *See Carrington v. Rash, supra*; *Cipriano v. City of Houma, supra.*

It is doubtful that the state can justify its differing treatment of independents under the strict test. As Judge Wisdom wrote in *Fontham*, "The statute must provide strong assurance both that the discrimination it encompasses is necessary to accomplish the state's important purpose and that the statute does in fact accomplish that purpose."[24]

Here the state can advance no reason for the discrimination between its citizens, other than speculation that raiding attempts are more likely to come from the group it discriminates against than the other group. The state has offered no empirical evidence that their speculation is correct and it is doubtful that factual evidence on this subject can be obtained. The state has not demonstrated, as it must, that the statute does achieve its goal, i. e., that it does prevent raiding.[25]

The statute does not prevent changes of party registration in order to raid which are made more than six months before a primary election. It does not prevent raiding by independents and new voters or attempts by other persons to influence the voting of independents and new voters. And it is only partially successful in preventing raiding within six months of the primary election by those registered with a political party. These voters can circumvent the effect of the statute merely by changing their registration first to independent and then to the opposing political party. Since the statute does not apply to those registering with a political party after having previously been registered as independent, they can vote in their new party primary at once.

Thus, the statute is not very effective in preventing raiding, but it does prevent or postpone changes in party affiliation by those who have no intention of raiding. It attempts to prevent badly motivated crossovers, but it prevents well motivated crossovers as well. It creates an irrebuttable presumption that a voter who wishes to change parties within six months of a primary election

24. Fontham v. McKeithen, *supra*, at 174.

25. Fontham v. McKeithen, supra, at 174.

**818**

intends to raid. Such an irrebuttable presumption was held unconstitutional in *Dunn v. Blumstein, supra*; and *Carrington v. Rash, supra*.

RATIONAL RELATIONSHIP TEST

██ Application of the rational relationship test places on the state a less onerous burden in justifying the statute. It must show the statute bears a rational relationship to the achievement of a valid state goal. *See United States Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

In *Dorrough v. Estelle, supra*, Judge Wisdom observed that

"Commentators have often noted that, at least at one time, this test seemed heavily weighted in favor of upholding the classification. It was a test of 'minimal scrutiny'. Today, however, whatever it may have been in the past, the rational relationship standard is relatively strict. Recent Supreme Court cases teach that the test calls for a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals." (Footnotes omitted).

██ Prevention of raiding is a legitimate state goal. *Rosario v. Rockefeller, supra*; *Kusper v. Pontikes, supra*. Whether the Louisiana statute is reasonably related to the achievement of that goal must be determined.

██ It has been pointed out previously that the statute does not fully prevent raiding. However, this fact alone does not require invalidation of the statute. Analysis according to the rational relationship test does not require that the statute be perfect. It need not be stricken merely because it does not correct every possible aspect of the problem. *See Schilb v. Kuebel*, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971); *McDonald v. Board of Election, supra*.

[14] The statute also creates a classification between groups of citizens according to whether they previously registered a political affiliation or not. The equal protection clause of the Fourteenth Amendment does not forbid differential classification of citizens by states, but it does require that the classification be based on some ground of difference having a rational relation to the goal of the legislation. *See Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

██ Here the basis of classification, i. e. whether one has registered a political affiliation, is not necessarily related to the likelihood that he will engage in raiding, the practice which the State desires to prevent.

While it may be true that raiding may more likely be found among those registered with a political party than among those who have no prior political affiliation, those who are persuaded by others to register with a party and influence the outcome of a particular election in return for money or some other advantage may as likely come from the ranks of independents or first-time registrants as from the opposing party.

The statutory scheme also rests on the presumption that those who switch parties more than six months before an election are less likely to raid than those who switch parties closer to the election. Again this conclusion does not necessarily follow. It may be just as true that the voter who is politically aware enough to change his registration six months in advance of a primary is more likely to raid than one who waits until the election is near and well publicized.

The Louisiana statute bears no rational relationship to the prevention of raiding. Though in *Rosario v. Rockefeller* the New York statute was held to bear a rational relationship to the prevention of raiding, it is distinguishable from the Louisiana statute.

The New York law provided that one must enroll in a party 30 days before the general election in November in order to be eligible to vote in the party primary in June. If a voter fails to meet this deadline, his enrollment is not effective until after the next general election in November. Unlike the Louisiana law, it does not exempt new voters or independents from the effect of the law.[26]

Also, a voter in the New York system can change his registration before the general election in November and know that he will be eligible to vote in the next primary election the party conducts. In Louisiana, a voter does not have this assurance because primaries can be set on less than six months notice.[27]

In *Rosario*, the statute was held not to be "an arbitrary time limit unconnected to any important state goal," [28] because in addition to requiring party enrollment months in advance of the primary election, it required enrollment near the general election when attention was far from the primary. It required the voter to commit the deliberate inconsistency of registering affiliation with one party in order to vote in its primary while planning to vote in the near future for the other party.

Louisiana's statute, however, provides for no such "deliberate inconsistency." It imposes a time limit which the state

---

**26.** Those who reached voting age after the deadline for registering a party preference are permitted to register until thirty days before the primary and are permitted to vote in that primary.

**27.** See, e. g., L.S.A.–R.S. 18:304(A), 18:305, 18:358.

Primary elections are scheduled by statute as follows:

| Month | Day |
|---|---|
| August | Second Saturday following first Monday<br>Primary election for U.S. senator, U.S. representative, justice of supreme court, judge of court of appeal, member of public service commission, any other state official to be elected at congressional election; state, district, judicial, parish, ward or municipal officers to be elected at congressional election. |
| September | Six weeks after second Saturday following first Monday in August<br>Second primary election for U.S. senator, U.S. representative, state, district, judicial, parish, ward or municipal officers elected at congressional elections. |
| November | First Saturday<br>Primary election for governor and other state officials, district, parochial and ward officers elected with state officials; justice of supreme court, judge of court of appeal, member of public service commission or other officer of state character to be elected with the governor. |
| November | First Saturday after first Monday in November<br>Primary election for New Orleans parochial and municipal officers. |
| December | Five weeks after first Saturday after first Monday in November<br>Second primary election for New Orleans parochial and municipal officers.<br>Six weeks after first Saturday in November<br>Second primary election for governor, other state officials; justice of supreme court; judge of court of appeal, member of public service commission, other officer of state character elected with governor. |

**28.** Rosario v. Rockefeller, 410 U.S. at 760, 93 S.Ct. at 1251, 36 L.Ed.2d at 8 (1973).

has not shown is rationally related to the prevention of raiding or is anything other than an arbitrary choice.

We conclude that the Louisiana statute fails the rational relationship test. It would also fail the stricter compelling state interest test. *See Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

We have no reason to doubt that the defendant state and parish officials will, in good faith, abide by our ruling herein. It is, therefore, unnecessary to issue any injunctions with respect to them. However, we retain jurisdiction for the purpose of hereafter entering any orders necessary to enforce the views expressed herein.

The plaintiff originally prayed for an award of attorney's fees. However, that claim has since been waived. (See Record, Document No. 11).